NATALIE K. WIGHT, OSB #035576
United States Attorney
District of Oregon
**CARLA GOWEN MCCLURG, OSB #165144**
carla.mcclurg@usdoj.gov
**ALEXIS A. LIEN, OSB #110569**
Assistant United States Attorneys
alexis.lien@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
KIRK T. MANHARDT
TERRANCE A. MEBANE
**THOMAS PORTS, Va. Bar 84321**
thomas.ports@usdoj.gov
**ALEXIS DANIEL, In. Bar 35718-53**
alexis.daniel2@usdoj.gov
**VICTOR S. LEUNG, N.Y. Bar 5584032**
victor.leung@usdoj.gov
U.S. Department of Justice
Civil Division, Commercial Litigation Branch
P.O. Box 875,
Ben Franklin Station
Washington, D.C. 20044-0875
Telephone: (202) 307-0488
*Attorneys for the United States of America*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>    **Plaintiff,**<br><br>    **v.**<br><br>**PACIFICORP and**<br>**PACIFIC POWER,**<br><br>    **Defendants.** | **3:24-cv-2102**<br><br>**COMPLAINT**<br><br>**(Demand for Jury Trial)** |

**Complaint**                                                                                 **Page 1**

Plaintiff the United States of America ("United States") brings this action against Defendants PacifiCorp and Pacific Power (collectively, " Defendants") for damages arising out of the "Archie Creek Fire," which ignited on the morning of September 8, 2020, in Douglas County, Oregon and quickly spread to catastrophically burn over 130,000 acres.

Defendants' negligence caused the Archie Creek Fire to ignite.  The Archie Creek Fire was not fully contained until October 31, 2020. During the approximately six weeks it burned, the Archie Creek fire caused significant damage to federally owned and managed forest lands, timber, natural resources, wildlife habitat, trails, roads, bridges, campgrounds, and other infrastructure. The United States incurred substantial suppression costs, reforestation and restoration costs, stabilization costs, and suffered devastating infrastructure and other damages, including without limitation ruined wildlife habitat, natural resource destruction, and timber loss.  To recover these considerable costs and damages, amounting to hundreds of millions of dollars, the United States pleads:

## INTRODUCTION

1.  The Archie Creek Fire ignited on the morning of September 8, 2020, below Defendants' power line equipment.  The Archie Creek Fire quickly spread to consume 100,000 acres within twenty-four hours of ignition.  It burned extremely hot and spread very quickly.

2.  The Archie Creek Fire was not fully contained until October 31, 2020, at which point it had burned 131,542 acres of public and private land, destroyed hundreds of private residences, and decimated thousands of acres of timber and habitat.

3.  Of the 131,542 acres of land damaged by the Archie Creek Fire, approximately 67,074 acres are owned by the United States and administered by federal agencies: 26,645 acres of Umpqua National Forest land and 40,429 acres of Bureau of Land Management administered

land.  The pictures below of the Falls Creek Trail area—a popular local hiking spot—before and
after the Archie Creek Fire show just one example of the devastation of federal land it caused.



Falls Creek Trail area before and after the Archie Creek Fire[1]



Falls Creek Trail area before and after the Archie Creek Fire[2]

---

[1] Still photo captures from video footage by Elijah Finlay available at: https://www.youtube.com/watch?v=iX1NPjbC1xk
[2] *Id*.

**Complaint**                                                                                                         **Page 3**

4.      Defendants had a duty to maintain and operate their power lines and equipment to minimize fire danger. This duty arises from federal common law and from contractual obligations imposed through a license issued to Pacific Power by the Federal Energy Regulatory Commission ("FERC") on November 18, 2003 (the "FERC License"). The FERC License allows Defendants to operate power lines and equipment associated with their 185.5-megawatt North Umpqua Project No. 1927-008 on federal land and requires Defendants, among other things, to do "everything reasonable" to prevent wildfires.[3]

5.      Defendants breached their duties by at least failing to: (1) appropriately inspect, operate, and maintain their power line equipment; (2) reasonably manage the vegetation along their power lines; (3) take reasonable safety precautions before and during known high-risk fire conditions in a high-risk fire area; and (4) reasonably investigate, patrol, and ensure the safe operation of their power lines and equipment during high-risk fire conditions in a high-risk fire area.

6.      As a result of the Archie Creek Fire, the United States suffered extensive property damage to federally owned and managed forest lands, timber, natural resources, wildlife habitat, trails, roads, bridges, campgrounds, and other infrastructure. The United States also incurred substantial costs to suppress the Archie Creek Fire and to address the aftermath of the blaze, including without limitation hazard tree removal, emergency stabilization, erosion control, and removal of hazardous materials.

7.      The United States brings this suit to recover its substantial costs and damages.

---

[3] 105 FERC ¶ 61,237.

## PARTIES

8.      Plaintiff the United States owns land in the State of Oregon administered by the United States' agencies, including the United States Department of Agriculture, Forest Service ("Forest Service") and the United States Department of the Interior, Bureau of Land Management ("BLM").  The Forest Service, the BLM, and other federal agencies, including the United States Department of the Interior, Bureau of Indian Affairs, routinely deploy agency personnel and resources to suppress wildfires when they occur in the State of Oregon.

9.      Defendant PacifiCorp is an Oregon corporation doing business as a public utility in Oregon.  PacifiCorp's headquarters are located at 825 NE Multnomah Street, Suite 2000, Portland, Oregon.  PacifiCorp is a wholly owned subsidiary of Berkshire Hathaway Energy.

10.     Defendant Pacific Power is a registered electric utility doing business in Oregon.  Pacific Power's headquarters are also located at 825 NE Multnomah Street, Suite 2000, Portland, Oregon.  According to its website, Pacific Power provides electric utility services to approximately 800,000 customers in 243 communities across Oregon, Washington, and California.  Pacific Power is a wholly owned subsidiary of PacifiCorp.

11.     Pacific Power is an assumed business name of PacifiCorp.  PacifiCorp does business in the State of Oregon as Pacific Power.  Defendants PacifiCorp and Pacific Power are jointly and severally liable for the costs and damages alleged herein.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 16 U.S.C. § 825p.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and 16 U.S.C. § 825p.  Defendants' principal place of business is located in Portland, Oregon in Multnomah County.

## **GENERAL ALLEGATIONS**

### ***Defendants owed the United States duties.***

13.    As regulated public entities operating power grids on federally owned and administered land in the State of Oregon,  Defendants' duties included those imposed by common law, state and federal rules and regulations, and the FERC License, 105 FERC ¶ 61.237.

14.     Defendants had a duty under applicable Oregon state statutes, rules, and regulations to: avoid causing fires; reasonably and safely maintain, inspect, operate, and repair their power line equipment; and keep vegetation properly trimmed and maintained.

15.    In the construction, repair, maintenance, inspection, and operation of their equipment and power lines, Defendants had duties to comply with state statutes, regulations, and standards, specifically including but not limited to:

    a.    ORS§ 757.020 (requiring utilities to furnish adequate and safe service, equipment and facilities);

    b.    ORS§ 757.035(1) (adopting safety rules and regulations for utilities);

    c.    Oregon Administrative Rule ("OAR") 860-024-0010 (requiring compliance with the American National Standards Institute's National Electricity Safety Code standards regarding the construction, operation, and maintenance of power lines);

    d.    OAR 860-024-0011 (regarding the inspection of power lines);

    e.    OAR  860-024-0016  (regarding  minimum  vegetation  clearance requirements); and

    f.    OAR 860-024-0017 (regarding vegetation pruning standards).

16.     The FERC License also imposed upon Defendants duties to: (1) properly and reasonably maintain and operate Defendants' electrical infrastructure and equipment, including all power lines, to ensure that they would not cause a fire; (2) adequately design, construct, monitor, operate, repair, and maintain power lines, poles, transformers, connectors, and other equipment; (3) maintain the land and vegetation around the power line infrastructure to ensure that vegetation, objects, and structures do not come into contact with electrical lines and equipment; and (4) prevent, make advance preparations for suppression of, and to suppress fires.

### Defendants have a record of safety violations.

17.     As demonstrated through the findings of regulators such as the Oregon Public Utilities Commission (the "Oregon PUC") and FERC, Defendants have an established history of failing to satisfy basic safety standards and taking little action to remedy known safety issues. Indeed, in the years leading up to the Archie Creek Fire, Defendants committed upwards of 250 vegetation clearance violations annually and knowingly and intentionally operated insufficiently maintained power lines.

18.     In a matter pending before the Oregon PUC at the time the Archie Creek Fire ignited, *In the Matter of PacifiCorp, dba Pacific Power, Request for a General Rate Revision*, Docket No. UE 374, the Oregon PUC observed that for much of 2003 through 2012, Defendants' vegetation clearance violations averaged fewer than 75 per year.  From 2013 through 2020, however, Defendants' vegetation clearance violations skyrocketed to regularly over 250 and never below 150 per year.

19.    The Oregon PUC laid out its findings in the following chart entitled: "PacifiCorp: Historical Vegetation Trend."[4]    This chart, shown below, displays the sharp increase in Defendants' vegetation clearance violations from 2013 through 2020:



20.    In July 2020, the Oregon PUC safety staff concluded the annual review of Defendants' vegetation clearances and documented 373 safety violations.[5]    The Oregon PUC issued a report documenting the violations and notified Defendants of those violations.[6]

21.    Defendants' record of safety violations is not limited to poor vegetation management practices.    PacifiCorp knowingly and intentionally operated transmission lines for

---

[4] Oregon PUC Docket No. UE 374 at Staff 600/Moore 10.
[5] OPUC Report No. E20-48R, PacifiCorp (Annual Vegetation Review).
[6] *Id*.

years that were so poorly maintained or obsolete that the lines should not have been permitted to hold any electrical current.

22.    On April 15, 2021, FERC issued an Order to Show Cause and Notice of Proposed Penalty (the "Order") against PacifiCorp arising from an investigation involving a 2012 Utah wildfire, the Wood Hollow Fire.[7]

23.    The Order notified PacifiCorp that FERC intended to fine PacifiCorp $42 million for PacifiCorp's knowing and pervasive failure to maintain and operate its power lines in a manner that would ensure proper tension.[8]

24.    In the Order, FERC found that PacifiCorp knowingly and intentionally failed to properly maintain its power grid.[9]

25.    FERC found that "at least 45 percent" of PacifiCorp's "Bulk Electric System" transmission lines were so poorly maintained or obsolete that they should not have carried any electrical current.[10]  FERC further found that PacifiCorp had been fully aware since at least 2009 of the failures and of the maintenance required to ensure the lines could be energized without causing dangerous sag that would risk igniting a fire.  PacifiCorp nonetheless declined to make the necessary repairs or upgrades "based upon a desire to avoid costly remediation measures."[11]

***Defendants' power line equipment caused fires in Southern Oregon before 2020.***

26.    Defendants' power line equipment caused wildfires in the Southern Oregon area before the Archie Creek Fire ignited.

---

[7] 175 FERC ¶ 61,039
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

**Complaint**                                                                                          **Page 9**

27.    The Williams Creek Fire ignited on July 28, 2009, along the North Umpqua River Highway 138 E near Glide, Oregon.  It burned over 8,300 acres—most of which was federal land—until it was contained on August 17, 2009.  The United States incurred over $16 million in suppression costs to extinguish the Williams Creek Fire.

28.    In litigation to recover those costs, the United States asserted that the Williams Creek Fire was caused by a fault on  Defendants' 115 KV Transmission Line 46.  The United States and  Defendants settled the United States' claims arising from the Williams Creek Fire in early 2017.

29.    The area in which the Archie Creek Fire ignited is approximately one mile away from where the Williams Creek Fire ignited, as depicted in the map below.



30.    The Bordeaux Fire ignited on July 28, 2010, at the end of Bordeaux Avenue in Medford, Oregon, below 115KV transmission line equipment owned by Defendants, Structure 7/37.  The Bordeaux Fire burned approximately 1.4 acres.

**Complaint**                                                                                                    **Page 10**

31.     Fire investigators concluded that  Defendants' equipment caused the Bordeaux Fire when dry grass below Structure 7/37 ignited following contact by melted fragments of a failed Ampact wedge connector and copper conductor strands, which are shown below.



32.      Defendants continued to use the same wedge connectors on their transmission lines in the area after the Bordeaux Fire and also in the Archie Creek Fire area.

***Defendants did not act to prevent wildfires from igniting on their equipment.***

33.     On Friday, September 4, 2020, the National Weather Service began to predict a large eastern windstorm bearing down on Oregon that prompted it to issue a fire weather watch. A fire weather watch means that there is a high potential for elevated fire risk danger.

34.     On Saturday, September 5, 2020, the National Weather Service continued to warn of strong east winds bringing critical weather conditions, upgrading the fire weather watch to a red flag warning.  A red flag warning means warm temperatures, very low humidities, and stronger winds combine to produce an increased risk of fire danger.

35.     On Sunday, September 6, 2020, the National Weather Service continued reporting the dangerous weather conditions posed by the upcoming windstorm, including by issuing a tweet to get the word out.

36.    On Monday, September 7, 2020, the National Weather Service issued increasingly severe warnings that the weather conditions posed an extreme fire danger beginning that afternoon and peaking overnight.  That day, September 7, 2020, dry east winds began to move through Washington toward Oregon, creating extremely critical fire conditions.

37.    At approximately 6:49 p.m. on September 7, 2020, multiple residents in the Chiloquin, Oregon area called 9-1-1 to report a fire later named the Two Four Two Fire.  The Two Four Two Fire ignited after a tree fell onto  Defendants' energized power line.

38.    On September 8, 2020, at about 12:15 a.m., a Glide, Oregon resident called 9-1-1 to report a fire he noticed near Mount Alto Ranch.  This fire, named the French Creek Fire, ignited below  Defendants' Transmission Line 39 ("Line 39"), Structures 3/14, 5/12, and 6/12.

39.    The French Creek Fire started after equipment on Structure 5/12 failed.  Melted Ampact wedge connectors and conductor strands from Structure 5/12 are pictured below.

 

40.    The French Creek Fire burned approximately 495 acres and was declared contained later in the day on September 8, 2020.

41.     Defendants kept Line 39 energized until about 2:45 a.m. on September 8, 2020, even though a tree fell across  Defendants' Transmission Line 42 ("Line 42") at about 12:02 a.m.

and even though the French Creek Fire ignited on Line 39 sometime before 12:15 a.m.  Line 42 is connected to Line 39.

### *Defendants' negligence caused the Archie Creek Fire.*

#### *The Archie Creek Fire ignites.*

42.    The Archie Creek Fire was first reported by an Oregon Department of Transportation employee at 2:34 a.m. on September 8, 2020.  The Archie Creek Fire ignited on lands and structures covered by Defendants' FERC License when the Defendants' power line equipment located on Line 39 Structure 3/30 ("Structure 3/30") failed.  When it was reported, the Archie Creek Fire was already about 40 acres in size.

43.    The melted aluminum Ampact wedge connector that was on Structure 3/30 at the time of the Archie Creek Fire was the same type of connector and showed similar damage as the connectors that melted and caused the French Creek Fire earlier that morning and caused the Bordeaux Fire years earlier.

44.    The melted connector and conductor strands from Structure 3/30 are pictured below.



*The Star Mountain Fire ignites and merges into the Archie Creek Fire.*

45.    Defendants continued to keep many of their power lines in the area energized after the French Creek and the Archie Creek Fires ignited.

46.    Hours after the French Creek and Archie Creek Fires ignited, another fire—the Star Mountain Fire—was reported to Douglas County Oregon 9-1-1 Dispatch at 8:58 a.m. on September 8, 2020, in the area off Susan Creek Road in Idelyld Park, Oregon.

47.    The Star Mountain Fire ignited approximately 9.8 miles from where the French Creek Fire ignited and approximately 7.3 miles from where the Archie Creek Fire ignited.  A map showing the distance between the fire ignition is set forth below.



48.    The Star Mountain Fire started below one of  Defendants' distribution lines in a rural residential area.  The Star Mountain Fire ignited when  Defendants re-energized a distribution line while a tree was still leaning on the line.  Defendants did not fully patrol the distribution line

before re-energizing it.  The tree became engulfed in flames, and the Star Mountain Fire quickly spread and soon thereafter merged into the Archie Creek Fire.[12]

### *The Archie Creek Fire damaged the United States.*

49.    The Archie Creek Fire catastrophically burned over 131,000 acres, including over 67,000 acres of federal land administered by the BLM and Forest Service.  The Archie Creek Fire burned for nearly eight weeks.

50.    The Archie Creek Fire occurred as a direct result of at least  Defendants' vegetation management failures; negligent operation, inspection, and/or maintenance of their power lines and equipment; failure to take reasonable safety precautions before and during known high-risk fire conditions in a high-risk fire area; and/or failure to reasonably investigate, patrol, and ensure safe operation of their power lines and equipment during high-risk fire conditions in a high-risk fire area.

## THE UNITED STATES' CLAIMS FOR RELIEF

### First Claim for Relief

#### *Count One: Negligence*

51.    The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

52.    Defendants had a duty to use reasonable care to inspect, maintain, and operate their power line equipment to prevent wildfires.

---

[12] Unless otherwise indicated, references in this Complaint to the Archie Creek Fire include the Star Mountain Fire, which merged into the Archie Creek Fire.

53.    The Archie Creek Fire ignited as a direct and proximate result of Defendants' breach of duty and negligence.

54.    Defendants' conduct created a foreseeable and unreasonable risk of harm to the United States.

55.    As the owner of public land in the vicinity of the places where the Archie Creek Fire ignited, the United States belonged to a class of persons who foreseeably might be injured by Defendants' acts and/or omissions.

56.    Defendants' negligent acts and/or omissions caused the Archie Creek Fire.

57.    Separately and independently, the United States is entitled to a presumption and inference of negligence under the doctrine of *res ipsa loquitur* because: (1) the ignition of the Archie Creek Fire was an incident of the kind that does not ordinarily occur in the absence of someone's negligence when all other potential causes of ignition are ruled out; (2) Defendants were in exclusive possession and control of the power line equipment below which the Archie Creek Fire ignited, making it more probable than not that the negligence was that of Defendants; and (3) the United States did not cause or contribute to the ignition of the Archie Creek Fire.

58.    As a result of the Archie Creek Fire, the United States incurred costs and suffered damages in an amount to be proved at trial.

### Count Two: Negligence Per Se

59.    The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

60.    Pursuant to the doctrine of negligence *per se*, Defendants had a duty to comply with laws, rules, and regulations and are liable for violating laws, rules, and regulations intended to prevent wildfires such as the Archie Creek Fire, including at least:

     a.     ORS § 757.020 (requiring utilities to "furnish adequate and safe service, equipment and facilities");

     b.     ORS § 757.032 (safety rules and regulations for utilities);

     c.     OAR 860-024-0010 (requiring compliance with the National Electrical Safety Code standards regarding the construction, operation, and maintenance of power lines);

     d.     OAR 860-024-011 (minimum requirements for the inspection of power lines);

     e.     OAR 860-024-0016 (minimum vegetation clearance requirements); and

     f.     OAR 860-024-0017 (vegetation pruning standards).

61.    Defendants violated the above statutes, rules, and regulations by at least failing to operate, patrol, inspect, and/or maintain their power line equipment to prevent wildfires from igniting on or near their equipment.

62.    The above statutes, rules, and regulations were promulgated to prevent wildfires like the Archie Creek Fire.

63.    Defendants' conduct created a foreseeable and unreasonable risk of harm to the United States.

64.    Defendants' violation of the above-referenced statutes, rules, and regulations caused the Archie Creek Fire to ignite and was the factual cause of substantial harm to the United States.

65.    The United States is one of the classes of persons or entities for whose protection the statutes, regulations, and rules were adopted.

66.     As a result of Defendants' negligence, the United States incurred costs and suffered damages in an amount to be proved at trial.

### Second Claim for Relief
#### *Trespass by Fire*

67.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

68.      Defendants negligently, and/or in violation of law, caused the Archie Creek Fire to ignite and both threaten and spread to lands owned and administered by the United States.

69.     The United States did not authorize Defendants to cause the Archie Creek Fire or to allow it to spread so as to endanger or enter upon the United States' property.

70.     As a direct, proximate, and substantial cause of Defendants' trespass by fire, the United States suffered damages in an amount to be proved at trial.

### Third Claim for Relief
#### *Common Law Nuisance*

71.     The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

72.     The Archie Creek Fire was a public nuisance under common law because it: (a) threatened and damaged federal lands and resources, (b) interfered with the use and enjoyment of public lands, and (c) harmed the United States.

73.     As a result of Defendants' nuisance, the United States incurred costs and suffered damages in an amount to be proved at trial.

### Fourth Claim for Relief
*Breach of License*

74.    The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

75.    The Federal Power Act establishes the laws governing FERC licensure of private parties.  The Act empowers FERC to issue licenses "for the purpose of constructing, operating and maintaining . . . power houses, transmission lines, or other project works . . . for the development, transmission, and utilization of power. . . .  Provided, That [such licenses] . . . shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation[.]"  16 U.S.C. § 797(e).

76.    The Federal Power Act further provides that "[e]ach licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor."  16 U.S.C. § 803(c).

77.    On November 18, 2003, FERC issued Defendants the FERC License, to operate the 185.5-megawatt North Umpqua Project No. 1927-008 (the "Project"). 105 FERC ¶ 61,237. The FERC License is incorporated into this Complaint by reference.

78.    The Project is located, as set forth fully in the FERC License, on the North Umpqua River and two of its tributaries, the Clearwater River and Fish Creek, in Douglas County.  The Project is located mostly on lands administered by the Forest Service and BLM.

79.    Within the Project boundaries, the Project includes Transmission Lines 39, 42, and 46.  Lines 39, 42, and 46 are project works under the FERC License.

**Complaint**                                                                                                    **Page 19**

80.     Structure 3/30 on Line 39 is also located within the Project boundaries under the FERC License, and Structure 3/30 on Line 39 is a project work under the FERC License.

81.     The FERC License includes specific terms and conditions, including FERC Terms and Conditions of License, Form L-1. Form L-1 is attached hereto as Exhibit 1.

82.     Article 22 of FERC Terms and Conditions of License, Form L-1 provides:

*Article 22.* The Licensee shall do everything reasonably within its power, and shall require its employees, contractors, and employees of contractors to do everything reasonably within their power, both independently and upon the request of officers of the agency concerned, to prevent, to make advance preparations for suppression of, and to suppress fires on the lands to be occupied or used under the license. The Licensee shall be liable for and shall pay the costs incurred by the United States in suppressing fires caused from the construction, operation, or maintenance of the project works or of the works appurtenant or accessory thereto under the license.

FERC Terms and Conditions of License, Form L-1, 54 F.P.C. 1792, p. 6.

83.     Article 24 of FERC Terms and Conditions of License, Form L-1 provides:

*Article 24.* The Licensee shall be liable for injury to, or destruction of, any buildings, bridges, roads, trails, lands, or other property of the United States, occasioned by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto under the license. Arrangements to meet such liability, either by compensation for such injury or destruction, or by reconstruction or repair of damaged property, or otherwise, shall be made with the appropriate department or agency of the United States.

*Id* at 7.

84.     Article 28 of FERC Terms and Conditions of License, Form L-1 provides:

*Article 28.* The Licensee shall make use of the Commission's guidelines and other recognized guidelines for treatment of transmission line rights-of-way, and shall clear such portions of transmission line rights-of-way across lands of the United States as are designated by the officer of the United States in charge of the lands; shall keep the areas so designated clear of new growth, all refuse, and inflammable material to the satisfaction of such officer; shall trim all branches of trees in contact with or liable to contact the transmission lines; shall cut and remove all dead or leaning trees which might fall in connect with the transmission lines; and shall take such other precautions against fire as may be required by such officer. No fires for the burning of waste material shall be set except with the prior written consent of the officer of the United States in charge of the lands as to time and place.

*Id.*

85.     Under the FERC License and the Federal Power Act, Defendants are strictly liable to the United States for costs and damages caused by the operation or maintenance of Defendants' power lines and related equipment.

86.     At all times material to this action, the FERC License imposed valid and binding contractual obligations upon Defendants for the benefit of the United States.

87.     At all times material to this action, the United States complied with any and all obligations under the FERC License.

88.     Defendants' conduct in connection with the maintenance and/or operation of the Project works or of the works appurtenant or accessory thereto under the FERC License caused the Archie Creek Fire and injured or destroyed buildings, bridges, roads, trails, campgrounds, lands, and other property of the United States.

89.     On March 15, 2023, the United States made demand upon Defendants for payment of the United States' incurred and projected costs and damages as a result of the Archie Creek Fire. Defendants have not paid the United States for these costs and damages as of the date of this Complaint.

90.     Defendants violated the terms of the FERC License by at least:

    a.     Causing the Archie Creek Fire to ignite through the maintenance and/or operation of the Project works, as the term Project works is defined under the FERC License;

    b.     Failing to safely maintain its power lines and related equipment within the Project boundary and all works appurtenant to its power lines;

    c.     Failing to safely operate its power lines and related equipment within the Project boundary and all works appurtenant to their power lines;

    d.      Failing to trim all trees and branches of trees in contact with or liable to contact power lines within the Project boundary;

    e.      Failing to do everything reasonably within their power to prevent wildfires from igniting within the Project boundary, including the Archie Creek Fire;

    f.      Failing to pay the costs incurred by the United States in connection with suppressing the Archie Creek Fire; and

    g.      Failing to make arrangements with the appropriate agencies of the United States to satisfy  Defendants' liability to the United States under the FERC License, either by compensation for injury or destruction from  Defendants' maintenance or operation of the project works, or by reconstruction or repair of damaged property, or otherwise.

91.    As an actual, direct and foreseeable result of the foregoing breaches, the United States has suffered severe damages and incurred substantial costs in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands that judgment be entered in its favor against Defendants as follows:

A.  Payment to the United States for all costs and damages incurred by the United States because of the Archie Creek Fire;

B.  Payment to the United States for all of the United States' investigative, accounting, collection, and administrative costs resulting from the Archie Creek Fire;

C.  Interest, penalties, and damage multipliers to which the United States is entitled under

federal law, including but not limited to pursuant to the Debt Collection Act, 31 U.S.C. §

3717 and 43 C.F.R. § 9239.1-3(a);

D.  All other applicable costs, fees, and interest; and

E.  Such further relief as this Court deems just and equitable.

<u>**DEMAND FOR JURY TRIAL**</u>

The United States demands a jury trial in this case.

Dated:  December 19, 2024                     Respectfully submitted,

BRIAN M. BOYNTON                              NATALIE K. WIGHT
Principal Deputy Assistant Attorney General   United States Attorney
KIRK T. MANHARDT                              District of Oregon
Director
TERRANCE MEBANE                                _/s/ Carla G. McClurg_
Assistant Director                            **CARLA G. McCLURG, OSB #165144**
                                              Assistant United States Attorney
 _/s/ Thomas Ports_                           carla.mcclurg@usdoj.gov
**THOMAS PORTS, Va. Bar 84321**               **ALEXIS A. LIEN, OSB #110569**
Trial Attorney                                alexis.lien@usdoj.gov
thomas.ports@usdoj.gov                        Telephone: (503) 72-1000
**ALEXIS DANIEL, In. Bar 35718-53**
Trial Attorney
alexis.daniel2@usdoj.gov
**VICTOR S. LEUNG, N.Y. Bar 5584032**
Trial Attorney
victor.leung@usdoj.gov
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
Tel: (202) 307-0488
Fax: (202) 514-9163
_Attorneys for the United States_

**Complaint**                                                              **Page 23**

# Exhibit 1

**Form L-1**
(October, 1975)

### FEDERAL ENERGY REGULATORY COMMISSION

### TERMS AND CONDITIONS OF LICENSE
### FOR CONSTRUCTED MAJOR PROJECT AFFECTING
### LANDS OF THE UNITED STATES

**Article 1**. The entire project, as described in this order of the Commission, shall be subject to all of the provisions, terms, and conditions of the license.

**Article 2**. No substantial change shall be made in the maps, plans, specifications, and statements described and designated as exhibits and approved by the Commission in its order as a part of the license until such change shall have been approved by the Commission: Provided, however, That if the Licensee or the Commission deems it necessary or desirable that said approved exhibits, or any of them, be changed, there shall be submitted to the Commission for approval a revised, or additional exhibit or exhibits covering the proposed changes which, upon approval by the Commission, shall become a part of the license and shall supersede, in whole or in part, such exhibit or exhibits theretofore made a part of the license as may be specified by the Commission.

**Article 3**. The project area and project works shall be in substantial conformity with the approved exhibits referred to in Article 2 herein or as changed in accordance with the provisions of said article. Except when emergency shall require for the protection of navigation, life, health, or property, there shall not be made without prior approval of the Commission any substantial alteration or addition not in conformity with the approved plans to any dam or other project works under the license or any substantial use of project lands and waters not authorized herein; and any emergency alteration, addition, or use so made shall thereafter be subject to such modification and change as the Commission may direct. Minor changes in project works, or in uses of project lands and waters, or divergence from such approved exhibits may be made if such changes will not result in a decrease in efficiency, in a material increase in cost, in an adverse environmental impact, or in impairment of the general scheme of development; but any of such minor changes made without the prior approval of the Commission, which in its judgment have produced or will produce any of such results, shall be subject to such alteration as the Commission may direct.

**Article 4**. The project, including its operation and maintenance and any work incidental to additions or alterations authorized by the Commission, whether or not conducted upon lands of the United States, shall be subject to the inspection and supervision of the Regional Engineer, Federal Energy Regulatory Commission, in the region wherein the project is located, or of such other officer or agent as the Commission may designate,

Exhibit 1 - Page 1 of 9

who shall be the authorized representative of the Commission for such purposes. The Licensee shall cooperate fully with said representative and shall furnish him such information as he may require concerning the operation and maintenance of the project, and any such alterations thereto, and shall notify him of the date upon which work with respect to any alteration will begin, as far in advance thereof as said representative may reasonably specify, and shall notify him promptly in writing of any suspension of work for a period of more than one week, and of its resumption and completion. The Licensee shall submit to said representative a detailed program of inspection by the Licensee that will provide for an adequate and qualified inspection force for construction of any such alterations to the project. Construction of said alterations or any feature thereof shall not be initiated until the program of inspection for the alterations or any feature thereof has been approved by said representative. The Licensee shall allow said representative and other officers or employees of the United States, showing proper credentials, free and unrestricted access to, through, and across the project lands and project works in the performance of their official duties. The Licensee shall comply with such rules and regulations of general or special applicability as the Commission may prescribe from time to time for the protection of life, health, or property.

**Article 5**. The Licensee, within five years from the date of issuance of the license, shall acquire title in fee or the right to use in perpetuity all lands, other than lands of the United States, necessary or appropriate for the construction maintenance, and operation of the project. The Licensee or its successors and assigns shall, during the period of the license, retain the possession of all project property covered by the license as issued or as later amended, including the project area, the project works, and all franchises, easements, water rights, and rights or occupancy and use; and none of such properties shall be voluntarily sold, leased, transferred, abandoned, or otherwise disposed of without the prior written approval of the Commission, except that the Licensee may lease or otherwise dispose of interests in project lands or property without specific written approval of the Commission pursuant to the then current regulations of the Commission. The provisions of this article are not intended to prevent the abandonment or the retirement from service of structures, equipment, or other project works in connection with replacements thereof when they become obsolete, inadequate, or inefficient for further service due to wear and tear; and mortgage or trust deeds or judicial sales made thereunder, or tax sales, shall not be deemed voluntary transfers within the meaning of this article.

**Article 6**. In the event the project is taken over by the United States upon the termination of the license as provided in Section 14 of the Federal Power Act, or is transferred to a new licensee or to a nonpower licensee under the provisions of Section 15 of said Act, the Licensee, its successors and assigns shall be responsible for, and shall make good any defect of title to, or of right of occupancy and use in, any of such project property that is necessary or appropriate or valuable and serviceable in the maintenance and operation of the project, and shall pay and discharge, or shall assume responsibility for payment and

Exhibit 1 - Page 2 of 9

discharge of, all liens or encumbrances upon the project or project property created by the Licensee or created or incurred after the issuance of the license: Provided, That the provisions of this article are not intended to require the Licensee, for the purpose of transferring the project to the United States or to a new licensee, to acquire any different title to, or right of occupancy and use in, any of such project property than was necessary to acquire for its own purposes as the Licensee.

**Article 7**. The actual legitimate original cost of the project, and of any addition thereto or betterment thereof, shall be determined by the Commission in accordance with the Federal Power Act and the Commission's Rules and Regulations thereunder.

**Article 8**. The Licensee shall install and thereafter maintain gages and stream-gaging stations for the purpose of determining the stage and flow of the stream or streams on which the project is located, the amount of water held in and withdrawn from storage, and the effective head on the turbines; shall provide for the required reading of such gages and for the adequate rating of such stations; and shall install and maintain standard meters adequate for the determination of the amount of electric energy generated by the project works. The number, character, and location of gages, meters, or other measuring devices, and the method of operation thereof, shall at all times be satisfactory to the Commission or its authorized representative. The Commission reserves the right, after notice and opportunity for hearing, to require such alterations in the number, character, and location of gages, meters, or other measuring devices, and the method of operation thereof, as are necessary to secure adequate determinations. The installation of gages, the rating of said stream or streams, and the determination of the flow thereof, shall be under the supervision of, or in cooperation with, the District Engineer of the United States Geological Survey having charge of stream-gaging operations in the region of the project, and the Licensee shall advance to the United States Geological Survey the amount of funds estimated to be necessary for such supervision, or cooperation for such periods as may mutually agreed upon. The Licensee shall keep accurate and sufficient records of the foregoing determinations to the satisfaction of the Commission, and shall make return of such records annually at such time and in such form as the Commission may prescribe.

**Article 9**. The Licensee shall, after notice and opportunity for hearing, install additional capacity or make other changes in the project as directed by the Commission, to the extent that it is economically sound and in the public interest to do so.

**Article 10**. The Licensee shall, after notice and opportunity for hearing, coordinate the operation of the project, electrically and hydraulically, with such other projects or power systems and in such manner as the Commission may direct in the interest of power and other beneficial public uses of water resources, and on such conditions concerning the equitable sharing of benefits by the Licensee as the Commission may order.

Exhibit 1 - Page 3 of 9

**Article 11**. Whenever the Licensee is directly benefited by the construction work of another licensee, a permittee, or the United States on a storage reservoir or other headwater improvement, the Licensee shall reimburse the owner of the headwater improvement for such part of the annual charges for interest, maintenance, and depreciation thereof as the Commission shall determine to be equitable, and shall pay to the United States the cost of making such determination as fixed by the Commission. For benefits provided by a storage reservoir or other headwater improvement of the United States, the Licensee shall pay to the Commission the amounts for which it is billed from time to time for such headwater benefits and for the cost of making the determinations pursuant to the then current regulations of the Commission under the Federal Power Act.

**Article 12**. The operations of the Licensee, so far as they affect the use, storage and discharge from storage of waters affected by the license, shall at all times be controlled by such reasonable rules and regulations as the Commission may prescribe for the protection of life, health, and property, and in the interest of the fullest practicable conservation and utilization of such waters for power purposes and for other beneficial public uses, including recreational purposes, and the Licensee shall release water from the project reservoir at such rate in cubic feet per second, or such volume in acre-feet per specified period of time, as the Commission may prescribe for the purposes hereinbefore mentioned.

**Article 13**. On the application of any person, association, corporation, Federal agency, State or municipality, the Licensee shall permit such reasonable use of its reservoir or other project properties, including works, lands and water rights, or parts thereof, as may be ordered by the Commission, after notice and opportunity for hearing, in the interests of comprehensive development of the waterway or waterways involved and the conservation and utilization of the water resources of the region for water supply or for the purposes of steam-electric, irrigation, industrial, municipal or similar uses. The Licensee shall receive reasonable compensation for use of its reservoir or other project properties or parts thereof for such purposes, to include at least full reimbursement for any damages or expenses which the joint use causes the Licensee to incur. Any such compensation shall be fixed by the Commission either by approval of an agreement between the Licensee and the party or parties benefiting or after notice and opportunity for hearing. Applications shall contain information in sufficient detail to afford a full understanding of the proposed use, including satisfactory evidence that the applicant possesses necessary water rights pursuant to applicable State law, or a showing of cause why such evidence cannot concurrently be submitted, and a statement as to the relationship of the proposed use to any State or municipal plans or orders which may have been adopted with respect to the use of such waters.

**Article 14**. In the construction or maintenance of the project works, the Licensee shall place and maintain suitable structures and devices to reduce to a reasonable degree the liability of contact between its transmission lines and telegraph, telephone and other signal

Exhibit 1 - Page 4 of 9

wires or power transmission lines constructed prior to its transmission lines and not owned by the Licensee, and shall also place and maintain suitable structures and devices to reduce to a reasonable degree the liability of any structures or wires falling or obstructing traffic or endangering life. None of the provisions of this article are intended to relieve the Licensee from any responsibility or requirement which may be imposed by any other lawful authority for avoiding or eliminating inductive interference.

**Article 15**. The Licensee shall, for the conservation and development of fish and wildlife resources, construct, maintain, and operate, or arrange for the construction, maintenance, and operation of such reasonable facilities, and comply with such reasonable modifications of the project structures and operation, as may be ordered by the Commission upon its own motion or upon the recommendation of the Secretary of the Interior or the fish and wildlife agency or agencies of any State in which the project or a part thereof is located, after notice and opportunity for hearing.

**Article 16**. Whenever the United States shall desire, in connection with the project, to construct fish and wildlife facilities or to improve the existing fish and wildlife facilities at its own expense, the Licensee shall permit the United States or its designated agency to use, free of cost, such of the Licensee's lands and interests in lands, reservoirs, waterways and project works as may be reasonably required to complete such facilities or such improvements thereof. In addition, after notice and opportunity for hearing, the Licensee shall modify the project operation as may be reasonably prescribed by the Commission in order to permit the maintenance and operation of the fish and wildlife facilities constructed or improved by the United States under the provisions of this article. This article shall not be interpreted to place any obligation on the United States to construct or improve fish and wildlife facilities or to relieve the Licensee of any obligation under this license.

**Article 17**. The Licensee shall construct, maintain, and operate, or shall arrange for the construction, maintenance, and operation of such reasonable recreational facilities, including modifications thereto, such as access roads, wharves, launching ramps, beaches, picnic and camping areas, sanitary facilities, and utilities, giving consideration to the needs of the physically handicapped, and shall comply with such reasonable modifications of the project, as may be prescribed hereafter by the Commission during the term of this license upon its own motion or upon the recommendation of the Secretary of the Interior or other interested Federal or State agencies, after notice and opportunity for hearing.

**Article 18**. So far as is consistent with proper operation of the project, the Licensee shall allow the public free access, to a reasonable extent, to project waters and adjacent project lands owned by the Licensee for the purpose of full public utilization of such lands and waters for navigation and for outdoor recreational purposes, including fishing and hunting: Provided, That the Licensee may reserve from public access such portions of the project waters, adjacent lands, and project facilities as may be necessary for the protection

Exhibit 1 - Page 5 of 9

of life, health, and property.

**Article 19**. In the construction, maintenance, or operation of the project, the Licensee shall be responsible for, and shall take reasonable measures to prevent, soil erosion on lands adjacent to streams or other waters, stream sedimentation, and any form of water or air pollution. The Commission, upon request or upon its own motion, may order the Licensee to take such measures as the Commission finds to be necessary for these purposes, after notice and opportunity for hearing.

**Article 20**. The Licensee shall clear and keep clear to an adequate width lands along open conduits and shall dispose of all temporary structures, unused timber, brush, refuse, or other material unnecessary for the purposes of the project which results from the clearing of lands or from the maintenance or alteration of the project works. In addition, all trees along the periphery of project reservoirs which may die during operations of the project shall be removed. All clearing of the lands and disposal of the unnecessary material shall be done with due diligence and to the satisfaction of the authorized representative of the Commission and in accordance with appropriate Federal, State, and local statutes and regulations.

**Article 21**. Timber on lands of the United State cut, used, or destroyed in the construction and maintenance of the project works, or in the clearing of said lands, shall be paid for, and the resulting slash and debris disposed of, in accordance with the requirements of the agency of the United States having jurisdiction over said lands. Payment for merchantable timber shall be at current stumpage rates, and payment for young growth timber below merchantable size shall be at current damage appraisal values. However, the agency of the United States having jurisdiction may sell or dispose of the merchantable timber to others than the Licensee: <u>Provided</u>, That timber so sold or disposed of shall be cut and removed from the area prior to, or without undue interference with, clearing operations of the Licensee and in coordination with the Licensee's project construction schedules. Such sale or disposal to others shall not relieve the Licensee of responsibility for the clearing and disposal of all slash and debris from project lands.

**Article 22**. The Licensee shall do everything reasonably within its power, and shall require its employees, contractors, and employees of contractors to do everything reasonably within their power, both independently and upon the request of officers of the agency concerned, to prevent, to make advance preparations for suppression of, and to suppress fires on the lands to be occupied or used under the license. The Licensee shall be liable for and shall pay the costs incurred by the United States in suppressing fires caused from the construction, operation, or maintenance of the project works or of the works appurtenant or accessory thereto under the license.

**Article 23**. The Licensee shall interpose no objection to, and shall in no way prevent, the use by the agency of the United States having jurisdiction over the lands of

Exhibit 1 - Page 6 of 9

the United States affected, or by persons or corporations occupying lands of the United States under permit, of water for fire suppression from any stream, conduit, or body of water, natural or artificial, used by the Licensee in the operation of the project works covered by the license, or the use by said parties of water for sanitary and domestic purposes from any stream, conduit, or body of water, natural or artificial, used by the Licensee in the operation of the project works covered by the license.

**Article 24**. The Licensee shall be liable for injury to, or destruction of, any buildings, bridges, roads, trails, lands, or other property of the United States, occasioned by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto under the license. Arrangements to meet such liability, either by compensation for such injury or destruction, or by reconstruction or repair of damaged property, or otherwise, shall be made with the appropriate department or agency of the United States.

**Article 25**. The Licensee shall allow any agency of the United States, without charge, to construct or permit to be constructed on, through, and across those project lands which are lands of the United States such conduits, chutes, ditches, railroads, roads, trails, telephone and power lines, and other routes or means of transportation and communication as are not inconsistent with the enjoyment of said lands by the Licensee for the purposes of the license. This license shall not be construed as conferring upon the Licensee any right of use, occupancy, or enjoyment of the lands of the United States other than for the construction, operation, and maintenance of the project as stated in the license.

**Article 26**. In the construction and maintenance of the project, the location and standards of roads and trails on lands of the United States and other uses of lands of the United States, including the location and condition of quarries, borrow pits, and spoil disposal areas, shall be subject to the approval of the department or agency of the United States having supervision over the lands involved.

**Article 27**. The Licensee shall make provision, or shall bear the reasonable cost, as determined by the agency of the United States affected, of making provision for avoiding inductive interference between any project transmission line or other project facility constructed, operated, or maintained under the license, and any radio installation, telephone line, or other communication facility installed or constructed before or after construction of such project transmission line or other project facility and owned, operated, or used by such agency of the United States in administering the lands under its jurisdiction.

**Article 28**. The Licensee shall make use of the Commission's guidelines and other recognized guidelines for treatment of transmission line rights-of-way, and shall clear such portions of transmission line rights-of-way across lands of the United States as are designated by the officer of the United States in charge of the lands; shall keep the areas so

Exhibit 1 - Page 7 of 9

designated clear of new growth, all refuse, and inflammable material to the satisfaction of such officer; shall trim all branches of trees in contact with or liable to contact the transmission lines; shall cut and remove all dead or leaning trees which might fall in contact with the transmission lines; and shall take such other precautions against fire as may be required by such officer. No fires for the burning of waste material shall be set except with the prior written consent of the officer of the United States in charge of the lands as to time and place.

**Article 29**. The Licensee shall cooperate with the United States in the disposal by the United States, under the Act of July 3l, 1947, 61 Stat. 681, as amended (30 U.S.C. sec. 601, et seq.), of mineral and vegetative materials from lands of the United States occupied by the project or any part thereof: Provided, That such disposal has been authorized by the Commission and that it does not unreasonably interfere with the occupancy of such lands by the Licensee for the purposes of the license: Provided further, That in the event of disagreement, any question of unreasonable interference shall be determined by the Commission after notice ad opportunity for hearing.

**Article 30**. If the Licensee shall cause or suffer essential project property to be removed or destroyed or to become unfit for use, without adequate replacement, or shall abandon or discontinue good faith operation of the project or refuse or neglect to comply with the terms of the license and the lawful orders of the Commission mailed to the record address of the Licensee or its agent, the Commission will deem it to be the intent of the Licensee to surrender the license. The Commission, after notice and opportunity for hearing, may require the Licensee to remove any or all structures, equipment and power lines within the project boundary and to take any such other action necessary to restore the project waters, lands, and facilities remaining within the project boundary to a condition satisfactory to the United States agency having jurisdiction over its lands or the Commission's authorized representative, as appropriate, or to provide for the continued operation and maintenance of nonpower facilities and fulfill such other obligations under the license as the Commission may prescribe. In addition, the Commission in its discretion, after notice and opportunity for hearing, may also agree to the surrender of the license when the Commission, for the reasons recited herein, deems it to be the intent of the Licensee to surrender the license.

**Article 31**. The right of the Licensee and of its successors and assigns to use or occupy waters over which the United States has jurisdiction, or lands of the United States under the license, for the purpose of maintaining the project works or otherwise, shall absolutely cease at the end of the license period, unless the Licensee has obtained a new license pursuant to the then existing laws and regulations, or an annual license under the terms and conditions of this license.

**Article 32**. The terms and conditions expressly set forth in the license shall not be

Exhibit 1 - Page 8 of 9

construed as impairing any terms and conditions of the Federal Power Act which are not expressly set forth herein.

Exhibit 1 - Page 9 of 9